**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID A. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 6744 |
| | ) | |
| SALVADOR GODINEZ et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff David Smith is an inmate at Stateville Correctional Center. He filed two claims under 42 U.S.C. § 1983 for deliberate indifference to a substantial risk of serious harm, alleging that his conditions of confinement are unconstitutionally inhumane and that his incarcerators failed to mitigate known hazards inherent in his work as a prison groundskeeper. After Mr. Smith's *pro se* complaint was narrowed pursuant to 28 U.S.C. § 1915(e) and following a lengthy stay pending developments in a related class action, Mr. Smith acquired counsel and the defendants—various high-level officers within Illinois' prison system—moved for summary judgment. The defendants argue they were not deliberately indifferent to the risks of harm associated with each of Mr. Smith's claims, nor are those harms objectively serious. The defendants also claim qualified immunity. But when the disputed facts are viewed in the light most favorable to Mr. Smith, a reasonable jury could conclude that both his failure to protect claim and the inadequate sanitation component of his conditions of confinement claim have merit. The defendants are also not entitled to qualified immunity. Their motion for summary judgment is therefore denied in part. It is granted, however, with respect to all components of Mr. Smith's conditions of confinement claim that do not implicate unsanitary conditions.

BACKGROUND[1]

Stateville Correctional Center is a maximum-security facility located about an hour outside of Chicago in Crest Hill, Illinois. The Illinois Department of Corrections (IDOC) first opened Stateville in 1925, and revelations offered in the past decade regarding the facility's upkeep suggest it has seen better days. In 2011 and 2013, the John Howard Association—an independent correctional oversight organization—issued monitoring reports warning of "dire consequences" from Stateville's "harsh, dehumanizing conditions," which, in its summation, included "substandard heating, cooling and air ventilation; infestations of cockroaches and other pests; poor sanitation due to malfunctioning toilets, plumbing, and showers that are peeling and decaying; broken and non-functioning windows; and a physical plant that is overall dilapidated and falling apart." John Howard Ass'n, Monitoring Visit to Stateville Correctional Center 2011 at 2–3.[2] Although the reports centered on two of Stateville's six cell houses (Unit F and Unit X), *see id.* at 5, the organization noted "deterioration and lack of upkeep in many parts of the max facility." John Howard Ass'n, Monitoring Visit to Stateville Correctional Center 2013 at 12.[3] "Inmate reports of bird, rodent, cockroach, and spider infestations," it added, "were common and credible." *Id.*

---

[1] The facts are undisputed unless otherwise noted. All disputed facts are sourced from Mr. Smith's deposition, his letters to the defendants, his administrative grievance, and two affidavits from fellow inmates. *See* Pl.'s Statement of Additional Material Facts, ECF No. 163 ("PSOF").

[2] *See* Archive of Reports on Stateville Correctional Center, John Howard Ass'n, http://www.thejha.org/facilities/stateville-correctional-center (last visited Jan. 5, 2023).

[3] Stateville's notorious Unit F has since been officially closed by order the Governor of Illinois. Tina Sfondeles, *State Closes Door on Stateville Prison "Roundhouse"*, Chi. Sun Times (Nov. 30, 2016, 10:18 PM), http://chicago.suntimes.com/news/state-closes-door-on-stateville-prison-roundhouse.

Perhaps unsurprisingly, Mr. Smith was not the first, or only, inmate to sue over Stateville's living conditions. Among other cases, a class action was filed in early 2013, and by January 2014, a class was certified covering "all individuals incarcerated at the Stateville Correctional Center at any time since January 1, 2011, and all individuals who will be housed at the Stateville Correctional Center in the future." Order Granting Class Certification ¶ 2, *Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill. Jan. 23, 2014), ECF No. 37. Mr. Smith is a member of this class and his conditions of confinement claim concerns many of the same issues involved in the class claim. Order 1–2, ECF No. 99. (As of this opinion, class settlement negotiations are ongoing.) Nonetheless, because the class—certified under Federal Rule of Civil Procedure 23(b)(2)—seeks only injunctive relief, the class action does not preclude individual class member claims for damages. *Id*. Mr. Smith accordingly filed a section 1983 suit in August 2014 after exhausting his administrative remedies. *See* 42 U.S.C. § 1997e(a); Ill. Adm. Code tit. 20, §§ 504.800–504.870. At Mr. Smith's request, this case was stayed in 2016 pending resolution of the *Dobbey* class action. *See* Stay Order, ECF No. 104. In 2018, however, the Court granted Mr. Smith's request for recruitment of settlement counsel. Although ensuing settlement discussions did not resolve the case, Mr. Smith's settlement counsel subsequently volunteered to take on full representation of Mr. Smith. Mot. to Vacate Stay, ECF No. 120.

The complaint asserts two claims: one based on conditions within Stateville's walls and one for failure to protect against hazards on Stateville grounds. The following defendants are named in their individual capacities: Marcus Hardy, Stateville's Warden (c. 2009 to 2013); Darryl Coleman, Stateville's Assistant Warden of Operations (c. 2011 to 2013); John Luchsinger, Stateville's Chief Engineer (c. 2003 to 2010); and Salvador Godinez, the Director of IDOC (c. 2011 to 2014).

A. <u>Conditions of Confinement</u>

Mr. Smith has been an inmate at Stateville since 2003. Throughout that time, he has resided in all six of Stateville's cell houses. His conditions of confinement claim is not expressly focused on a particular cell, although it may be reasonably inferred that his asserted injuries stem from his time within two Unit C cells. In any event, the defendants take no issue with this potential lack of specificity.

The defendants dispute the following facts on various grounds.

According to Mr. Smith, his six-by-ten-foot cell is "horrendously unsanitary." Resp. 3, ECF No. 161. He and a cellmate share a toilet, sink, and bunk bed, and the only cleaning supplies they receive is one scoop per week of "extremely diluted" disinfectant. PSOF ¶ 5. Mr. Smith and his cellmate are required to use the disinfectant the same day they receive it. They are also required to purchase their own washcloths from the Stateville commissary (the only cleaning supplies available for purchase). The combination of confined quarters and inadequate cleaning supplies, Mr. Smith says, turns his cell into a "Petri dish" of bodily fluids and excrement. PSOF ¶ 3.

Mr. Smith alleges that his cell is also inadequately ventilated. It does not have air conditioning or a window. Its air vent is sealed, and the main cell house ventilation system is inoperable. To compensate, the cell house, which has five cell floors, runs a single exhaust fan on the first floor. No exhaust fans run on the upper floors where Mr. Smith resides. Given that heat rises, this first-floor exhaust fan is not sufficient to mitigate the extreme heat Mr. Smith is subjected to. Neither are the two nine-inch fans Mr. Smith and his cellmate run inside their cell. He claims air does not circulate.

Vermin are an additional problem. A throng of birds, rodents, and insects swarm Stateville and Mr. Smith's cell. They leave feces, urine, and dander throughout, including inside his personal property box where he stores his food and clothing. He suffers mosquitos, and he has once attended sick call to treat an unidentified insect bite. A contract pest exterminator visits Stateville on a monthly basis, but only routinely attends to common areas (*e.g.*, the kitchen).

At one point, an electrical socket inside Mr. Smith's cell began popping and emitting bursts of sparks. (He experienced the same thing in both of his Unit C cells.) The socket sits eight inches from Mr. Smith's bed. This, Mr. Smith claims, is a fire hazard. He adds that Stateville does not conduct fire drills, nor does it have a sprinkler system or fire extinguishers in the cell houses. Also, in the event of a fire, the cell doors must be opened manually.

When electricians arrived a week or more later to fix Mr. Smith's socket problem, they attributed it to the facility's leaking water pipes. Relatedly, Mr. Smith says that he has seen mold in his cell and throughout Stateville.

Finally, the gallery lights are on twenty-four hours a day at Stateville. They shine into Mr. Smith's cell, and he is prohibited from hanging anything on his bunk or in his cell to block the light.

Mr. Smith blames his living conditions for the health problems he has endured since at least 2013. He says his squalid living conditions—his inadequately sanitized quarters, the vermin infestation, the lack of ventilation, the mold—combine to severely inflame his allergies and have caused him to suffer rashes and chronic ear and sinus infections. He is also sleep deprived. The gallery lights which shine into his cell twenty-four hours a day, the excessive heat, noises from resident birds, and the constant need to fight-off crawling insects all prevent him from sleeping soundly.

B. Failure to Protect

Inmates are permitted but not required to work various paid jobs at Stateville. In 2011, Mr. Smith began work as a prison groundskeeper. He mowed grass, removed weeds, and trimmed trees under the supervision of groundskeeping staff. He also regularly cleaned up debris—such as broken windows, siding, or roofing—when it fell upon prison grounds from dilapidated buildings found around Stateville. The only protective gear Mr. Smith was provided for this work was cloth gardening gloves.[4]

On August 30, 2012, Mr. Smith's groundskeeping supervisor instructed him to remove debris around an industrial building. Glass block windows had fallen from the building and they needed to be removed before the area could be mowed. While attempting to retrieve one of the windows, a glass shard pierced Mr. Smith's glove and sliced his left hand. He was taken to the hospital where he eventually underwent surgery to repair nerve and tendon damage to his left thumb.

The defendants dispute the extent to which Mr. Smith and other prison groundskeepers warned the defendants of relevant groundskeeping hazards prior to Mr. Smith's injury. Mr. Smith says he requested protective equipment (safety goggles, reinforced boots, leather gloves, dust masks) from the groundskeeping supervisor on multiple occasions prior to his injury. So too did two of Mr. Smith's fellow groundskeepers. On two separate occasions, the three men also claim they spoke directly with Mr. Hardy (the Warden) about the need for protective equipment. Mr. Coleman (the Assistant Warden of Operations) was present for the

---

[4] The defendants do not dispute that Mr. Smith was provided "gardening gloves." Defs.' Statement of Material Facts ¶ 25, ECF No. 156 ("DSOF"). In a subsequent filing, however, the defendants acknowledge only that he was provided gloves and dispute the characterization of those gloves as "gardening" gloves. Resp. to PSOF ¶ 38, ECF No. 170. The defendants' inconsistent position makes no difference; Mr. Smith claims they were gardening gloves, and so for the purpose of opposing of summary judgment, they are.

conversation Mr. Smith claims he had with Mr. Hardy, whereat Mr. Hardy instructed Mr. Smith to put his concerns in writing. As for the separate conversation Mr. Smith's fellow groundskeepers jointly had with Mr. Hardy, they both recall Mr. Hardy stating that "he had been made aware of [their] concerns by the other guys on the crew and that [they] should just be careful." Perez Aff. 2, ECF No. 163-8; Oaks Aff. 2, ECF No. 163-7.

Mr. Smith also expressed his safety concerns during a chance encounter with Mr. Godinez (the Director of IDOC). In response, Mr. Godinez instructed Mr. Smith to write Mr. Hardy. Complying with that instruction, Mr. Smith addressed a letter dated April 11, 2012, to Mr. Hardy and Mr. Coleman detailing the "inherent dangers" groundskeepers face while "clean[ing] up trash[] [and] debris that has fallen off the condemned buildings and the broken glass block windows that [are] repeatedly [found] along these same buildings." Apr. Letter 1, ECF No. 163-9. The letter reiterated the need for and specifically requested protective equipment. Mr. Smith never received a response to this letter; however, he did speak with Mr. Hardy on several subsequent occasions and Mr. Hardy told him he was considering it.

With his safety concerns left unaddressed by Mr. Hardy and Mr. Coleman, Mr. Smith wrote a second letter—this time addressed to Mr. Godinez and dated July 8, 2012. In the letter, Mr. Smith detailed all of his prior failed attempts at acquiring protective equipment and again explained the hazards and pressed his request. No response was received. Mr. Smith lacerated his thumb approximately two months later.

The defendants have moved for summary judgment on both claims.

## DISCUSSION

Summary judgment is only appropriate if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Factual disputes are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255. Hence, in order to defeat summary judgment, a nonmoving plaintiff need only identify specific, admissible evidence from which a verdict in his favor may reasonably result. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

Here, most of the specific evidence Mr. Smith relies upon is disputed. The defendants nevertheless argue that both of Mr. Smith's deliberate indifference claims fail as a matter of law. In making this argument, the defendants largely ignore Mr. Smith's evidence (his deposition, for instance) and refer instead to their own version of events.[5] They also make a sweeping argument that most of Mr. Smith's evidence is irrelevant. *See* Resp. to PSOF 1–15, ECF No. 170. But "summary judgment cannot be used to resolve swearing contests between litigants," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); and it is inconceivable how the plaintiff's description of his experience at Stateville and his interactions with the defendants are irrelevant. Personal knowledge, especially when detailed and specific, is sufficient to rebut a motion for summary judgment. *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006). Analysis of Mr. Smith's Eighth Amendment claims therefore proceeds under the assumption that his version of events is correct.

---

[5] *See, e.g.*, Resp. to DSOF ¶¶ 16, 19, 21, 27, 28–30, 35, 37, ECF No. 162 (examples where defendants assert facts in direct contradiction to the deposition of Mr. Smith).

The Eighth Amendment's prohibition on cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, to ensure that inmates receive adequate food, clothing, shelter, and medical care, and to take reasonable measures to guarantee inmates' safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "This means that a constitutional violation inheres in a prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate." *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020) (citing *Farmer*, 511 U.S. at 828). These so-called "deliberate indifference" violations have both an objective and a subjective component. *Id*. That is, a violation only occurs if (1) a prisoner has been exposed to a harm that was objectively serious, and (2) a prison official knew of and disregarded excessive risk of that harm. *Id*. Each component will be addressed in turn.

## I. Objectively Serious Harm

The Supreme Court has narrowly defined "objectively serious" harms as those which "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). These deprivations must be "extreme," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and do not include "restrictive" or "even harsh" retributive conditions permitted under contemporary standards of decency, *Rhodes*, 452 U.S. at 347.

A. Conditions of Confinement

Many of the conditions Mr. Smith supposedly lives with are alike in kind if not severity to conditions previously deemed unconstitutional. *See Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987) ("[A] state must provide . . . reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (*i.e.*, hot and cold water, light, heat, plumbing)." (quoting *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980))). For example, regarding sanitation, the Seventh Circuit in *Vinning–El v. Long* reversed summary judgment dismissal of a conditions of

confinement claim involving "a floor covered with water, a broken toilet, feces and blood smeared along the wall, and no mattress to sleep on." 482 F.3d 923, 925 (7th Cir. 2007). As for vermin infestations, the Seventh Circuit in *Antonelli v. Sheahan* reinstated a dismissed complaint which alleged that "cockroaches . . . were everywhere, crawling on [the prisoner's] body (along with mice) and constantly awakening him . . . ." 81 F.3d 1422, 1431 (7th Cir. 1996) (internal quotations omitted). And with respect to inadequate ventilation, the Seventh Circuit held in *Board v. Farnham* that allegations of an "extremely poor" system involving ducts lined with fiberglass dust and black mold were "more than sufficient" to withstand summary judgment. 394 F.3d 469, 486 (7th Cir. 2005).

The defendants' point to these cases and argue that each of Mr. Smith's alleged conditions, when viewed in isolation, pale in comparison. Mr. Smith counters that his various conditions should be considered in combination, not individually. To an extent, both parties are wrong. "***Some*** conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone . . . ." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis in original) (quoting *Rhodes*, 452 U.S. at 347). Yet "[t]o say that some prison conditions may interact" to form a constitutional violation "is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes." *Id*. Only when multiple conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise" shall courts consider them in combination. *Id.*; *Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013). Mindful of this, what follows below is an examination of the individual parts of Mr. Smith's conditions of confinement claim ending in an appraisal of their effect in combination.

Before proceeding, however, a note on the relevancy of injury is warranted. "Objectively serious" harms are not limited to harms which cause physical injury. *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). This is not to say that physical injuries are irrelevant to the Eighth Amendment inquiry. The extent of injuries suffered by inmates is one factor that may suggest the severity of the conditions about which they complain. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (holding same in excessive force context). In addition, while the Prison Litigation Reform Act denies recovery "for mental or emotional injury suffered while in custody without a prior showing of physical injury," 42 U.S.C. § 1997e(e), psychological harms alone may still give rise to an Eighth Amendment violation and provide a basis for a civil action for nominal and punitive damages and/or injunctive relief. *Thomas*, 697 F.3d at 614. And regardless of whether an alleged injury is physical or psychological, to have a cognizable claim, "plaintiffs alleging deliberate indifference must, 'at a minimum, specifically describe not only the injury but also its relation to the allegedly unconstitutional condition.'" *Scinto v. Stansberry*, 841 F.3d 219, 229–30 (4th Cir. 2016) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 n.9 (4th Cir. 1993)). "There is no requirement, however, that a plaintiff alleging deliberate indifference present expert testimony to support his allegations of serious injury or substantial risk of serious injury." *Id.* at 230. "[E]xpert testimony is necessary . . . only when it will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702(a)). Hence, a lack of medical or scientific evidence may be dispositive only when the seriousness of harm would not be apparent to a layperson. *Id.*; *see, e.g.*, *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (inmate permissibly relied on common-sense link between asthma and excessive dust and dander); *Holland v. Hanks*, 139 F.3d 901, at *3 (7th Cir. 1998) (plaintiffs impermissibly offered no evidence, other than their own beliefs, that second-hand smoke in cells caused nosebleeds,

dizziness, headaches, and shortness of breath); *see also Gray*, 826 F.3d at 1007 (claims for future injuries require "a degree of reasonable medical certainty" that inmate faces an increased risk of injury).

Turning now to the individual parts of Mr. Smith's conditions of confinement claim:

- **Hygiene**. Mr. Smith characterizes his cell as filthy. He blames it on the fact that he and his cellmate are only permitted a small dose of disinfectant once a week to clean their shared sink and toilet. He does not claim his sink or toilet are broken or that he is forced to coexist with human waste left by anyone other than himself or his cellmate—he only claims that he lives in uncomfortable proximity to a bathroom that is soiled by, yet otherwise adequately services, the weekly hygiene needs of himself and another adult male. This description of filth falls short of the unconstitutionally unsanitary conditions in *Vinning–El*, which included a "sink and toilet [that] did not work," "walls [that] were smeared with blood and feces," and a cell devoid of "toilet paper, towels . . . [and] soap." *See* 482 F.3d at 924. The fact that Mr. Smith or his cellmate were the source of his cell's filth also reduces the potency of any corresponding harm. *See Isby v. Clark*, 100 F.3d 502, 506 (7th Cir. 1996) ("[A]n inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on."). In short, although Mr. Smith's cell might benefit from additional supply of disinfectant, this deprivation by itself does not rise to a constitutional violation. "Inmates cannot expect the amenities, conveniences and services of a good hotel . . . ." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988).

- **Ventilation**. Mr. Smith decries inadequate ventilation; however, he spent little time describing this condition when asked about it in deposition. In his administrative grievance, Mr. Smith generally describes stagnant air full of "dust, dirt, mold, pest

dander, airborne viruses and wool fibers" and rank with odors of animal and human waste.[6] The Constitution does not guarantee fragrant air, however. *See Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("[A]n unpleasant odor . . . , along with the absence of any evidence of serious injury, does not amount to constitutional deprivation."). That Mr. Smith and his cellmate were each permitted a personal fan within their small cell also undermines his claim that the air was stagnant. And to whatever extent Mr. Smith's environment is full of airborne contaminants, he offers no medical or scientific evidence beyond lay observations to substantiate his claim. A similar claim was dismissed in *Dixon v. Godinez*, where the Seventh Circuit affirmed summary judgment against an inmate who only offered "conclusory allegations, without backing from medical or scientific sources, that the rank air exposed him to diseases and caused respiratory problems which he would not otherwise have suffered." 114 F.3d 640, 645 (7th Cir. 1997). Without more, then, Mr. Smith's inadequate ventilation claim cannot reasonably impose liability.

▪ ***Cooling.*** Because of inadequate ventilation, Mr. Smith says his cell is extremely hot. Yet the record is devoid of any evidence that might help a jury quantify that claim. Mr. Smith does not attempt a guess at the temperature within his cell. Nor does he describe anything that would indicate extreme heat (for example, metal bars too warm to touch or a bunk bed soaked with perspiration). Mr. Smith also claims no heat-related illnesses; he simply asserts that the temperature within Stateville affects his sleep. But even temperatures that occasionally exceed 95°F do not violate the Eighth Amendment. *Chandler v. Crosby*, 379

---

[6] Mr. Smith also says toxins from lead paint fill the air, but his claim based on lead paint at Stateville was previously dismissed on initial screening. Order 2, ECF No. 11; *accord* 28 U.S.C. § 1915(e).

F.3d 1278, 1297 (11th Cir. 2004). And the electric fans provided to Mr. Smith and his cellmate offer at least some cooling effect. *Cf. Dixon*, 114 F.3d at 645 (inmate's possession of electric fan undercut summertime heat claim). Without any specific facts bearing on Mr. Smith's extreme heat claim, it is not reasonable to infer the temperature at Stateville is any more than uncomfortable. *Cf. Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (affirming summary judgment dismissal of sleep deprivation claim in part because inmate "presented no evidence regarding the duration of the alleged excessive heat").

- ▪ **Fire Safety.** Although the Eighth Amendment guarantees a certain degree of fire safety, it does not constitutionalize state and municipal fire codes. *French v. Owens*, 777 F.2d 1250, 1257 (7th Cir. 1985). In other words, "not every deviation from ideally safe conditions constitutes a violation of the constitution." *Id.* (quoting *Santana v. Collazo*, 714 F.2d 1172, 1183 (1st Cir. 1983)). Actionable deviations tend to implicate multiple facets of fire safety, such as fire susceptibility, detection, evasion, and abatement. *See Hadix v. Johnson* 367 F.3d 513, 528–29 (6th Cir. 2004) (compiling cases into a continuum of fire safety violations). Here, Mr. Smith has provided very little evidence to suggest Stateville is unduly susceptible to fire. He has not, for example, provided evidence that fires have occurred in the past, that flammable materials are negligently warehoused, or that the facility itself is particularly combustible (based on its layout or construction). He does highlight the issue with his cell's electrical sockets as a danger. But the issue was rectified within a reasonable period after it was reported, and so it provides little cause for alarm. Regarding fire detection, Mr. Smith provides no evidence that Stateville is deficient (such as a lack of smoke alarms). He also only marginally

indicts Stateville's fire evasion capability by alleging that Stateville does not conduct fire drills and that his cell door cannot be automatically opened in the event of a fire. But while this is not ideal, he does not implicate the more serious issues that can arise with fire evasion, such as nonexistent evacuation plans, severe overcrowding, or limited or locked emergency exits. *Cf. id.* (collected cases). Mr. Smith's concerns regarding the lack of fire abatement equipment (such as a sprinkler system and fire extinguishers) are reasonable, but considering Mr. Smith's fire safety claim in totality, it appears no more egregious than in *Johnson v. Texas Board of Criminal Justice*, where the Fifth Circuit considered a substantially similar fire safety claim involving "no fire alarms or fire detection systems, poor electrical equipment, and inadequate staff in living areas" but dismissed it because the inmate did "not allege that anyone had been injured by any type of fire or that [the prison] was built from flammable materials or was particularly susceptible to fires." 281 F. App'x 319, 320–22 (5th Cir. 2008). Mr. Smith has likewise not presented a triable fire safety issue.

- **Pest Infestation.** Mr. Smith contends Stateville is "infected with multiple pests[,] including birds, rats, mice, cockroaches, red ants, spiders, flies, mosquitos, gnats, and moths." Ex. A to Smith Dep. 3, ECF No 163-2 ("Grievance"). He describes Stateville as a "pseudo-aviar[y]," with birds nesting and leaving droppings and feathers everywhere (including in his cell) and feeding from prisoner food carts. *Id*. Rats and mice "run[] rampant throughout" and the cockroaches which infest his cell "frequently crawl on [him] while [he] sleep[s] at night." *Id*. Rats, mice, and insects have invaded his personal property box, soiling the food, clothing, and personal items within. PSOF ¶ 2. He has once visited sick call to treat a minor insect bite and has "been bitten numerous times" by

15

mosquitos while in the shower. *Id.* ¶ 24; Grievance at 3. All told, the pest problem at Stateville sounds severe. It is doubtful reasonable citizens would consider living with an occasional cockroach, spider, fly, or mouse to be inhumane. *See Munson v. Kink*, No. 21-2738, 2022 WL 17844068, at *1–2 (7th Cir. Dec. 22, 2022) (dismissing infestation claim based on a single mouse bite); *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (dismissing infestation claim where inmate "often saw 'several' cockroaches crawling in his cell"). But it is hard to imagine when contemporary standards of decency were so miserable as to find acceptable the level of infestation that Mr. Smith describes. Even Edmond Dantès in 1821 detested the "many loathsome animals inhabit[ing] [his] prison." Alexandre Dumas, *The Count of Monte Cristo* (1846); *see also Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("[T]he repulsive nature of cockroaches and mice is hardly subject to dispute."). Thus, if Mr. Smith is to be believed (and, for purposes of this motion, he must be), a reasonable jury could find his compulsory pest cohabitation cruel and unusual.

▪ ***Mold.*** Hypothetically, certain levels of mold within a prison can by themselves violate the Eighth Amendment. *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020). There is no authority that clearly defines that threshold, however. *See id.* at 1013 (granting qualified immunity on a mold claim). Nonetheless, a jury is not needed to determine that Mr. Smith's mold claim falls short. This is because he offers only sparse, generalized statements about the mold he has seen in his cell and elsewhere at Stateville. Much like his inadequate ventilation claim, Mr. Smith does not offer any medical or scientific evidence to help substantiate the mold he has supposedly witnessed. He does claim that physicians at Stateville told him he may have a mold allergy and that dust and

mold at Stateville has caused him severe allergic reactions, as well as ear and sinus infections. If true, this might be enough to present a jury question. But on this record, the physicians' diagnosis is hearsay, *see* PSOF ¶ 23,[7] and so cannot be used to defeat summary judgment. Some other admissible evidence is therefore needed to reasonably infer that Mr. Smith's allergic reactions and infections were caused by mold and not some other condition at Stateville, such as the grass Mr. Smith mows as a groundskeeper.

▪ ***Lighting.*** "[S]ufficient or 'adequate lighting is one of the fundamental attributes of "adequate shelter" required by the Eighth Amendment.'" *Chappell v. Mandeville*, 706 F.3d 1052, 1057 (9th Cir. 2013) (quoting *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985)). Whether continuous lighting represents a constitutional violation depends on various factors, "including whether the lights caused sleep deprivation, the brightness and intensity of the lights, the duration of exposure, whether a legitimate penological justification existed, and whether prison officials were trying to keep the prisoner awake." *Id.* at 1059 (citations omitted). For instance, the Seventh Circuit has held that "24–hour lighting involving a single, 9–watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'" *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (quoting *Hudson*, 503 U.S. at 9). Compare that to *Keenan v. Hall*, where the Ninth Circuit denied summary judgment on a claim that "large florescent lights directly in front of and behind [an inmate's] cell shone into his cell 24 hours a day [for six months], so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' . . . caus[ing] him 'grave sleeping problems' and other mental and psychological problems." 83 F.3d 1083, 1091 (9th Cir. 1996) (quoting record). Critical to *Keenan*'s holding,

---

[7] It does not appear that any expert opinions will be offered at trial, either. No treating physicians were deposed and no expert opinions have been disclosed.

however, was the fact that the lights served no legitimate penological purpose. *See Chappell*, 706 F.3d 1057–58 (examining *Keenan*). That is not an issue here: Mr. Smith does not contest that the continuous lights at Stateville serve a security purpose. Resp. to DSOF ¶ 24, ECF No. 162. The constitutional question therefore hinges on the intensity, duration, and impact of Mr. Smith's cell lights. That is a fact-specific inquiry, and unfortunately, Mr. Smith does not supply many facts. He simply asserts that at all times relevant to this action, his cell house "flood lights" "beam[] on high 24 hours a day" outside of his cell "mak[ing] it impossible to get a proper, healthy and uninterrupted night's sleep." Grievance at 8. That description is too thin to reasonably connote ***extreme*** sleep deprivation. Mr. Smith does not need to photometrically describe his light situation in terms of footcandles or lux, but a fuller understanding of how he is sleep deprived is necessary. *Chavarria v. Stacks* contains a good example of what might suffice. There, an inmate averred that "six lights, three of them with fluorescent bulbs, shine into his cell twenty-four hours per day," offering him no place to gain respite from the strong lighting—"even under his bed [was] well lit." 102 F. App'x 433, 437–38 (5th Cir. 2004) (King, C.J., dissenting). This, the *Chavarria* inmate said, induced a chronic cycle of thirty to thirty-five hours of wakefulness interrupted only when overpowered by insomnious exhaustion. *Id.* at 438 n.1. Comparatively, Mr. Smith's plight is benign. In deposition, he merely claims that his continual lighting prevents him from sleeping "soundly." Smith Dep. 44:15–45:2, ECF No 163-2. But to reiterate, "the Constitution does not mandate comfortable prisons . . . ." *Rhodes*, 452 U.S. at 349. And additionally, Mr. Smith's light claim is diminished by the fact that Mr. Smith—although he claims he is prevented from hanging blankets in his cell—does not claim he is prevented from shielding his eyes with

a towel or shirt while he sleeps. *Cf. Isby v. Brown*, 856 F.3d 508, 518, 522 & n.12 (7th Cir. 2017) ("[A]ny Eighth Amendment concern implicated by twenty-four hour lighting . . . was negated by the fact that [the prisoner] can cover his eyes with clothes or towels."); *Mathews v. Raemisch*, 513 F. App'x 605, 607 (7th Cir. 2013) ("Allowing the plaintiffs to cover their eyes with towels was a reasonable response to their [light] complaints."); *Chavarria*, 102 F. App'x at 437 (Reavley, J., concurring) ("[W]ith deference to those who are concerned about Mr. Chavarria's illuminated cell, I regard this judicial attention as much ado about nothing. A little cloth over his eyes would solve the problem, negate deprivation, and escape this exercise in frivolity.").

With an understanding of the seriousness of the individual parts of Mr. Smith's conditions of confinement claim, the analysis now turns to how those parts combine to deprive identifiable human needs. Mr. Smith's overall claim involves three basic needs: personal safety, sanitation, and sleep. Mr. Smith's fire safety claim stands alone in implicating personal safety, and as discussed, it is not objectively serious on its own. Mr. Smith's personal (fire) safety claim is therefore dismissed.

Sanitation is implicated by Mr. Smith's hygiene, ventilation, infestation, and mold claims. Only the harm associated with the infestation claim is objectively serious on its own, but because the other claims appreciably contribute to this same harm, they too survive summary judgment. This conclusion comports with *Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016). There the Seventh Circuit addressed a conditions of confinement claim from a Stateville inmate who asserted that "myriad infestations and [a] lack of access to adequate cleaning supplies, taken together, deprived him of the basic human need of rudimentary sanitation in violation of the Eighth Amendment." *Id.* at 1005. The details of this claim are strikingly similar to the details of

19

Mr. Smith's hygiene and infestation claims, *see id.* at 1004; and without ruling on the individual parts of the claim, the *Gray* Court held that "[in] combination, . . . [they were] enough to defeat summary judgment for [Warden Hardy]." *Id.* at 1006.

As for the need for sleep, it is implicated by Mr. Smith's cooling, ventilation, lighting, and infestation claims. Here, the harm caused by Stateville's supposed infestation weighs far less than it did when considering sanitation. Mr. Smith says that noises from resident birds and the need to fight-off crawling insects interrupts his sleep. This alone does not carry the day. Nor, as discussed, do his cooling, ventilation, or lighting claims. It is reasonable to infer that excessive heat, inadequate ventilation, twenty-four hour lighting, and bird and insect activity may in combination cause sleep deprivation when each alone would not do so. But whatever sleep deprivation this combination has caused Mr. Smith, his asserted injury indicates it is not extreme. In deposition, Mr. Smith merely claimed that he cannot sleep "soundly." PSOF ¶ 25. This injury does not even surpass that claimed in *Vasquez v. Frank*, where the Seventh Circuit affirmed summary judgment dismissal of a sleep deprivation claim based on "constant light, poor ventilation, and extremely hot temperatures" in part because no medical evidence linked the inmate's asserted injuries (insomnia, dizziness, migraines, difficulty breathing, and eye irritation) with the alleged conditions of confinement. 290 F. App'x 927, 928–29 (7th Cir. 2008). The description of Mr. Smith's sleep deprivation contained in his administrative grievance is no more severe. There he simply claims that his conditions of confinement "make[] it impossible to get a proper, healthy and uninterrupted nights sleep." Grievance at 8.[8] But one can imagine that many

---

[8] This description and the one-off deposition remark constitute the entirety of Mr. Smith's sleep deprivation evidence. *See* PSOF ¶ 25. Notably, the evidence was gathered before Mr. Smith retained counsel and the defendants were understandably content with the short shrift Mr. Smith gave to their sleep deprivation questions in deposition. But if Mr. Smith was unsatisfied with the summary judgment record by the time counsel was appointed, he could have

20

adults living outside Stateville struggle with getting a proper, healthy, uninterrupted night's sleep. No reasonable jury would consider that inhumane.

To recap, Mr. Smith's personal safety and sleep deprivation claims fail to withstand summary judgment. Based on the disputed evidence of Stateville's hygiene, ventilation, infestation, and mold conditions, a triable issue exists on whether Mr. Smith's unsanitary living conditions are objectively serious. The claim is cognizable given the psychological harm Mr. Smith has asserted. *See Bentz v. Hardy*, 638 F. App'x 535, 538 (7th Cir. 2016) ("[D]epending upon the extent, duration, and kind of infestation an inmate was made to endure, a trier of fact still may reasonably find that an Eighth Amendment violation occurred even without a showing of physical harm."); *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) ("The potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious."). But compensatory damages may still be unavailable. The solitary insect bite Mr. Smith endured left only a "red mark" and required nothing more than anti-itch ointment. Smith Dep. 36:1-11, ECF No 163-2. It is therefore *de minimis*, which does not suffice as a "physical injury" under the Prison Litigation Reform Act. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (citing *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)). And as for Mr. Smith's other asserted physical injuries (his allergies, ear and sinus infections, and rashes), no admissible medical evidence has been provided to link them to his unsanitary living conditions. In the absence of such evidence at trial, then, Mr. Smith may be limited to nominal and punitive damages. *Gray*, 826 F.3d at 1008.[9]

---

conducted additional discovery. *See* Order, ECF No. 122 (vacating stay and reopening discovery).

[9] To whatever extent Mr. Smith's sanitation claim is not subsumed by the class action claim in *Dobbey v. Weilding*, he could—had he sued the defendants in their official capacities—

B. Failure to Protect

The harm identified in Mr. Smith's failure to protect claim is objectively serious. Mr. Smith required surgery to repair nerve and tendon damage to his left thumb after lacerating it on a glass shard while performing his groundskeeping duties. The defendants do not adequately argue that this is not objectively serious harm.

## II. Deliberate Indifference to Substantial Risk

"[A] prison official cannot be found liable under the Eighth Amendment" for objectively serious harms "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. This requisite knowledge can be demonstrated in the usual ways, including through circumstantial evidence. *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). For instance, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. "[P]rison officials who actually knew of a substantial risk to inmate health or safety can nevertheless escape liability if they responded reasonably to the risk, whether or not the harm was ultimately averted." *LaBrec*, 948 F.3d at 841 (citing *Farmer*, 511 U.S. at 844–45).

"[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). "Indeed, once an official is alerted to an excessive risk to inmate safety or

---

also be theoretically entitled to injunctive relief. Here, since he has only sued the defendants in their individual capacities, he is limited to monetary relief.

health through a prisoner's correspondence, 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015) (quoting *Vance*, 97 F.3d at 993). Nonetheless, even if communications are addressed directly to certain high-level prison officials, those officials are not typically involved in day-to-day decisions affecting inmates, nor can they realistically be "expected to be personally involved in resolving a situation pertaining to a particular inmate unless it were of the gravest nature." *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996). High-level officials can, however, "be expected to know of or participate in creating systemic, as opposed to localized, situations." *Id.* at 1429.

Before turning to specific evidence of the defendants' knowledge, some winnowing at the outset is feasible. Mr. Smith acknowledges that Mr. Luchsinger (the Chief Engineer at Stateville from 2003 to 2010) was not employed at Stateville at any time relevant to his hand injury. Resp. to DSOF ¶ 31, ECF No. 162. He also omits Mr. Luchsinger from his argument imputing knowledge of his living conditions to the defendants. *See* Resp. 10–13, ECF No. 161. The Court reads this as a tacit concession that Mr. Luchsinger was not deliberately indifferent. Mr. Luchsinger is therefore dismissed.[10]

### A. Conditions of Confinement

The administrative grievance detailing Mr. Smith's conditions of confinement claim was addressed to and reviewed in some capacity by Mr. Hardy's office. (Mr. Smith also asserts he sent two additional letters regarding his living conditions, but those letters were supposedly lost

---

[10] It also appears that Mr. Luchsinger would have a viable statute of limitations defense since he left employment at Stateville in 2010 and Mr. Smith filed his complaint in 2014. The statute of limitations in Illinois for section 1983 claims is two years. *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). No limitations defense was advanced on Mr. Luchsinger's behalf, however.

in the mail.) The grievance bears a signature of Mr. Hardy's name, followed by the initials of an assistant—indicating, according to Mr. Hardy, that he was not the actual signatory. The parties dispute whether the initials absolve Mr. Hardy of personal knowledge of Mr. Smith's living conditions. But this dispute over Mr. Smith's communications makes no difference. The unsanitary conditions Mr. Smith asserts are not personal to him—he claims they exist throughout Stateville. They are therefore systemic conditions, knowledge of which can be fairly imputed to high-level Stateville officers. *See Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) ("[C]laims regarding . . . inadequate hygiene are conceivably systemic conditions that can support a valid claim against [the Sheriff] and [the Director of a jail] in their personal capacity.").

Based on practically the same systemic conditions that Mr. Smith describes, the Seventh Circuit has already held Mr. Hardy's knowledge of Stateville's living conditions and his disregard of the obvious risks they pose to be triable issues. *See Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) ("Even if [the plaintiff] had never filed the grievance, a jury could infer that [Mr. Hardy] was aware of the pest infestations in [Stateville]."). Hence, summary judgment for Mr. Hardy is precluded.

The claim in *Gray* did not involve the IDOC Director, but it does not require much extrapolation to impugn Mr. Godinez as well. He admitted in deposition that he visited Stateville "quite often" and it was his common practice to read monitoring reports from the John Howard Association. Godinez Dep. 46:4–50:6, ECF No. 163-13. Mr. Hardy also admitted he informed his supervisors of the problems identified in those reports. Hardy Dep. 5:14–6:11, ECF No. 163-3. The John Howard Association report from 2011 mimics portions of Mr. Smith's claim (especially the infestation issue), and the Association's report from 2013 indicates the infestation issue had not abated. This would reasonably suggest to any reader, such as Mr. Godinez, that

whatever measures taken since 2011 to address the issue were ineffective. Accordingly, Mr. Godinez's knowledge of Mr. Smith's living conditions and his potential deliberate indifference to them are suitable jury questions. *Cf. Hardy v. Godinez*, No. 12 C 6033, 2017 WL 2569605, at *9–10 (N.D. Ill. June 12, 2017) (denying summary judgment for Mr. Hardy and Mr. Godinez on similar Stateville sanitation claim).

That leaves Mr. Coleman, the Assistant Warden of Operations. In that role, Mr. Smith claims Mr. Coleman was Stateville's "Safety and Sanitation Coordinator." PSOF ¶ 21. This fact is disputed, but whatever his official duties were, Mr. Coleman acknowledges he was in charge of—among other things—maintenance at Stateville. Coleman Dep. 5:19-20, ECF No. 163-5. That responsibility included maintenance of Stateville's ventilation. *Id.* at 16:3–17:23. It also positioned him as the direct supervisor for Stateville's pest extermination coordinator, who arranged monthly, routine exterminator visits to Stateville's general facilities and as-needed visits to individual cells whenever the Warden approved a grievance request for pest control. *Id.* at 7:22–16:2. Mr. Smith claims that infrequent exterminator visits to individual cells were ineffective at combating Stateville's infestation.[11]

The incomplete picture these facts paint preclude summary judgment for Mr. Coleman. It can be reasonably inferred that Mr. Coleman had knowledge of the infestation problem based on its obvious scope and severity. (To a limited extent, he also admits knowledge of it in deposition.) But, given that he did oversee at least a limited (albeit ineffective) response to the issue, one interpretation of Mr. Smith's version of the facts is that Mr. Coleman was either

---

[11] It is not clear from the evidence how often Stateville's contract pest exterminators visited individual cells, and no party asserts a figure. Notably, evidence in *Hardy v. Godinez*—a case involving the same exterminator company and a factually similar issue at Stateville— showed that the company "visited each cell house once a month, [but] it went inside individual cells only twice between 2010-12." No. 12 C 6033, 2017 WL 2569605, at *10 (N.D. Ill. June 12, 2017). The evidence in *Hardy* does not inform this case, however.

incompetent or under-resourced but not deliberately indifferent. *Cf. Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) ("It is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm."). However, it is not known what (if any) policy or procedural improvements where within Mr. Coleman's power to implement. And absent this information, another reasonable interpretation—especially given the protracted nature of the problem that Mr. Smith describes—is that Mr. Coleman is liable for deliberately persisting with an inadequate solution. *Cf. Gray*, 826 F.3d at 1009 ("Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference.").

B. <u>Failure to Protect</u>

Although Mr. Smith's sanitation claim is "potentially systemic," his failure to protect claim is "clearly localized" to him and his fellow groundskeepers. *See Antonelli*, 81 F.3d at 1429. No credence shall therefore be given to Mr. Smith's assertion that the episodic removal of debris around Stateville created hazards that were obvious to high-level Stateville officials, such as the defendants. *Id*. Evidence of prisoner communications with the defendants is what remains to potentially imply their knowledge. *See Perez*, 792 F.3d at 782 ("[P]risoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference." (quoting *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997)).

Mr. Smith claims he spoke directly with Mr. Hardy regarding the groundskeeping crew's need for protective equipment, including work gloves. Mr. Hardy told him to put his concerns in writing. Mr. Smith complied, sending Mr. Hardy a letter in April 2012 which reiterated the dangers groundskeepers face. Subsequently, Mr. Hardy told Mr. Smith on several occasions he was considering the issue. Two other groundskeepers also spoke directly with Mr. Hardy

regarding the need for protective equipment and both claim Mr. Hardy told them he was aware of the problem yet instructed them to just be careful. If all this is to be believed, a reasonable jury could find that Mr. Hardy was both aware of the risk faced by the groundskeeping crew and deliberately ignored that risk. *See Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Doing nothing **could** be simple negligence, but it does not stretch the imagination to see that it might also amount to deliberate indifference." (emphasis in original)).

The same holds true as to Mr. Coleman. According to Mr. Smith, Mr. Coleman was present for the conversation Mr. Smith had with Mr. Hardy. Mr. Smith's April 2012 letter was also addressed to Mr. Coleman, who was the Assistant Warden of Operations at the time, and responsible for, among other things, maintenance of the facility. Coleman Dep. 5:19-20, 16:3-4, 18:20-23, ECF No. 163-5. Mr. Coleman denied any recollection of the April 2012 letter but acknowledged it was prison policy to provide necessary safety equipment for groundskeeping crews at Stateville. *Id.* at 18:24–19:10. A reasonable jury could conclude that Mr. Coleman was on notice that necessary safety equipment was routinely not being provided, that Mr. Coleman learned of that problem, that it fell within his area of responsibility, and that Mr. Coleman nevertheless turned a blind eye to it. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (supervisor liability can be predicated upon turning a "blind eye" to serious problem within supervisor's area of responsibility).

The affirmative link to Mr. Godinez, however, is weak. Mr. Smith had a chance conversation with him regarding the need for protective equipment, and Mr. Godinez reasonably told Mr. Smith to address his concerns with Mr. Hardy. After Mr. Smith's April 2012 letter to Mr. Hardy failed to achieve results, he wrote Mr. Godinez a similar letter in June 2012. Again, no response was received. The letter, then, is all that links Mr. Godinez to Mr. Smith's failure to

protect claim. But as Director of IDOC, this letter is not enough to hold Mr. Godinez liable for prisoner equipment decisions at Stateville. *See Williams v. Raemisch*, 545 F. App'x 525, 529 (7th Cir. 2013) ("The secretary [of the Department of Corrections] did not supervise the day-to-day operations of the prison, so his receipt of [a prisoner's] letter is insufficient to establish liability for deliberate indifference.").

### III. <u>Qualified Immunity</u>

"In actions under 42 U.S.C. § 1983 alleging violations of constitutional rights, qualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conduct was not clearly established at the time he acted." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). "In determining whether a right was 'clearly established' at the time of an official action, [courts] must look at the right violated in a 'particularized' sense, rather than 'at a high level of generality.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). When available, controlling precedent from either the Supreme Court or the Seventh Circuit guides this inquiry. *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). "However, a case holding that the exact action in question is unlawful is not necessary." *Id.* "Even where there are notable factual distinctions, prior cases may give an officer reasonable warning that his conduct is unlawful." *Id.*

The defendants assert qualified immunity for both the conditions of confinement claim and the failure to protect claim. This opinion has already catalogued numerous Seventh Circuit opinions which are both akin to Mr. Smith's sanitation claim and predate it. *See* part I.A. As for Mr. Smith's failure to protect claim, it too is not novel. *See Smith v. Peters*, 631 F.3d 418, 420 (7th Cir. 2011) ("Failure to provide a prisoner required to work out of doors with minimal protective clothing, obviously including gloves, can . . . violate the Eighth Amendment, as countless cases have found."); *see, e.g.*, *Hall v. Bennett*, 379 F.3d 462, 465–66 (7th Cir. 2004)

(reversing summary judgment for prison officials who failed to provide electrical gloves to prisoner performing work as electrician). The deliberate indifference violations that Mr. Smith alleges were therefore clearly established at the times they occurred. Accordingly, qualified immunity is denied.

*     *     *

In summary, Plaintiff Smith has presented a triable inadequate sanitation claim against Defendants Hardy, Coleman, and Godinez, and a triable failure to protect claim against Defendants Hardy and Coleman. Summary judgment is granted to the defendants on all other conditions of confinement claims. Because no triable claim remains against Defendant Luchsinger, he is dismissed from the case.

Date: January 23, 2023

John J. Tharp, Jr.
United States District Judge